UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

EVANSTON INSURANCE COMPANY,

    Plaintiff/Counter-Defendant,

v.                                                      Case No. 1:08-CV-475

COGSWELL PROPERTIES, LLC                HON. GORDON J. QUIST

    Defendant/Counter-Plaintiff.
_____/

**MEMORANDUM OPINION**

Cogswell Properties, LLC (Cogswell) purchased an old, 440,000 square foot paper mill (the "Property") from the City of Otsego, Michigan at a tax foreclosure sale. On November 16, 2006, it purchased an insurance policy (the "Policy") covering $1,000,000 in real property and $250,000 in business personal property from Evanston Insurance Co. (Evanston), through Nulty Insurance (NI) and the J.M. Wilson Corp. (JMW). The Policy contained a coinsurance provision. If the Property were not insured for 80% of its value, Evanston would bear but a portion of the loss. Its share would be the proportion of the Policy's insured value to the Property's actual cash value at the time of the loss. Cogswell would bear the remainder.

After a fire, Evanston's appraiser valued the property at over $10,000,000. Since the Property was insured for only $1,000,000, Evanston invoked the Policy's coinsurance clause and claimed it was liable for a mere 12% of the damage. Cogswell disputed Evanston's assessment and hired its own appraiser, who valued the Property at $960,000. The Policy states that if the appraisers cannot agree on the Property's value, they may select an umpire to resolve the dispute. The parties could not agree on an umpire. Evanston petitioned the Circuit Court for the County of Allegan to appoint an umpire. They subsequently selected an umpire, rendering Evanston's initial petition moot.

Cogswell filed a counterclaim alleging breach of contract, violation of the Michigan Uniform Trade Practices Act, M.C.L. § 500.2001, *et seq.* The counterclaim seeks a declaratory judgment that Evanston's issuance of the Policy for $1,000,000 is a party admission that the Property's value is $1,000,000, that Evanston is estopped to assert that the Property's value exceeds $1,000,000, or both. In the alternative, Cogswell asks the Court to determine the Property's value and the extent of coinsurance. Each party has filed a motion for summary judgment. Although oral argument was requested, the Court has determined that it would not be helpful in rendering this decision.

## Summary Judgment Standard

Summary judgment is appropriate if there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56. A material fact is defined by substantive law and is necessary to apply the law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986). A genuine issue of fact exists if a reasonable jury could find for the non-moving party. *Id.* The Court must draw all inferences in the light most favorable to the non-moving party. However, a mere "scintilla of evidence in support of the [moving party's] position" is insufficient. *Anderson*, 477 U.S. at 252, 106 S. Ct. at 2512.

## What Happened

Cogswell began looking for insurance after it purchased the Property. It contacted NI, a retail insurance broker it had used before. NI contacted JMW, a wholesale insurance broker and managing agent, through which NI could access "surplus lines" insurance companies to which it would otherwise not have access. Cogswell requested a quote on a policy providing $2.5 million in building coverage and $1.5 million to cover its planned renovation. Cogswell estimated the Property would be worth $7 million to $8 million when the renovation was completed. Jager Dep. 30:5-7, Aug. 6, 2008. When Cogswell received a quote of $28,800 for a year's coverage, it decided

2

the premium was too high and requested building coverage of $1 million and another $1 million for the renovation. Jager Dep. 38:11-39:13; 41:13-19. JMW and NI warned Cogswell it would be a coinsurer if the coverage it selected did not adequately reflect the Property's value. Jager Dep. 47:1-21. When it received this quote, Cogswell requested another for building coverage of $1 million and business personal property coverage of $250,000. Again, Cogswell was warned coinsurance might apply. Cogswell purchased a policy from Evanston providing $1 million in building coverage and $250,000 in business personal property protection on November 16, 2006. The Property ignited that same day, causing $342,836.46 in damage.

## Analysis

### Cogswell's Claim of Estoppel and/or Party Admission

Cogswell asserts that Evanston affirmed the Property was worth $1 million when it insured it for that amount. Cogswell argues Evanston is equitably estopped to claim the Property is worth more. Equitable estoppel requires that Cogswell establish that: 1) Evanston induced Cogswell to believe Evanston valued the Property at $1 million; (2) Cogswell justifiably relied on this belief; and (3) Cogswell will be prejudiced if Evanston is now permitted to deny it. *McDonald v. Farm Bureau Ins. Co.*, 747 N.W.2d 811, 819-20 (Mich. 2008).

Cogswell has not met this burden. There is no evidence that Evanston induced Cogswell. Cogswell decided how much insurance to purchase. It reduced its requested coverage on the Property from $2.5 million to $2 million to $1 million to lower the premium. Jager Dep. 96:17-97:11. Evanston never suggested Cogswell should reduce the coverage or that the requested coverage exceeded the Property's value. When Cogswell requested less coverage, NI and JMW warned Cogswell that coinsurance could apply. Cogswell understood the coinsurance provision and independently determined that $1 million in "coverage [wa]s in line with coinsurance." Stites Dep. 41:3-5, Aug. 5, 2008. Cogswell's decision to purchase $1 million in coverage was its own.

3

If Cogswell believed Evanston was affirming that the Property was worth $1 million, that belief was not reasonable. Cogswell emphasizes that Evanston considers whether the requested coverage reasonably corresponds to the property's value. This does not justify concluding that Evanston's agreement to insure the Property for a particular amount is tantamount to a declaration of the Property's value.

Evanston required the Property be appraised within 30 days from when it issued the Policy. This would not have been necessary if Evanston already knew its value. Furthermore, if Evanston valued the Property at $1 million, it would not have had needed to warn Cogswell of the possibility of coinsurance.

Evanston understandably wishes to sell as much insurance as possible. It must also guard against overinsurance; a customer who stands to reap a windfall might have motive to commit arson. If, however, appraisal reveals the property is underinsured, Evanston can adjust the premium to reflect the Property's true value. Stites Dep. 44:17-22. Overinsurance thus poses greater risk to Evanston than underinsurance. Evanston issued the Policy before appraisal. The Court believes the only sound inference is that Evanston did not believe that the coverage grossly exceeded the Property's value.

Cogswell requested quotes for vastly differing amounts of coverage. It unilaterally determined how much coverage to purchase. JMW and NI warned Cogswell about coinsurance. When Evanston issued the Policy, it insisted the Property be appraised within 30 days. Accordingly, Cogswell could not have reasonably believed Evanston valued the Property at no more than $1 million.

## Whether Coinsurance Applies is not a Coverage Question

Cogswell asks the Court to decide how much the Property is worth. Cogswell is a coinsurer if the Property's actual cash value exceeds 125% of the Policy's real property coverage. Cogswell

4

insists this is a coverage issue because it has "nothing to do with determining the amount of the loss." Def's Br. at 14.

Appraisers may determine not only the amount of loss, but also the value of the property. M.C.L. § 500.2833 provides for appraisal when "the insured and insurer fail to agree on the actual cash value or amount of loss." Coverage questions address not the magnitude of the damage, but what damage, if any, is compensable. The courts have recognized that whether an exclusion applies is a question of coverage. *See Auto-Owners Ins. Co. v. Kwaiser*, 476 N.W.2d 467, 469-70 (Mich. Ct. App. 1991).

Whether coinsurance applies is not a coverage question. Coinsurance does not exclude a loss from coverage; it simply reduces the percentage of loss for which Evanston is liable. The Property's value should be determined by appraisers and an umpire pursuant to M.C.L. § 500.2833 and the insurance contract itself.

### Method of Valuation

The final question before the Court is what method of valuation should be used to determine the Property's actual cash value. Evanston asserts the appropriate method of valuation is the cost of replacement minus depreciation. Evanston's appraiser used the Property's square footage and an estimated cost per square foot to determine that the Property's replacement cost was $24,954,712. It calculated depreciation at $14,731,327.20 and thus determined the Property's actual cash value was $10,223,384.80. (Docket no. 17-10 at 2, 17-11 at 2-3.) Cogswell contends that market value is the appropriate measure. Market value is the price a property would fetch from a bona fide purchaser were the seller unconstrained by pressing time demands. Cogswell's appraiser used this approach and determined the Property to be worth $960,000.

The Court must look to the contract itself to determine the method of valuation. The objective of contract interpretation is to give effect to the parties' intention as expressed in the

5

contract as a whole. *Auto-Owners Ins. Co. v. Churchman*, 489 N.W.2d 431, 433-34 (Mich. 1992). This is true of an insurance contract as well. *Id.* at 433. The language must be given its ordinary, rather than a technical, meaning. *Arco Indus. Corp. v. Travelers Ins. Co.*, 730 F. Supp. 59, 66 (W.D. Mich. 1989). The Court must enforce an unambiguous, completely integrated contract "according to its plain meaning, without looking to extrinsic evidence." *Society St. Vincent Archdiocese v. Mt. Hawley Ins.*, 49 F. Supp. 2d 1011, 1016 (E.D. Mich. 1999) (internal citations omitted).

A contract amenable to a single interpretation is unambiguous; one amenable to two or more reasonable constructions is ambiguous. *Id.* (internal citations omitted). Ambiguities must be construed in favor of the insured. *Arco Indus. Corp. v. Am. Motorists Ins. Co.*, 531 N.W.2d 168, 172 (Mich. 1995). Extrinsic evidence of trade usage or custom may be used to clarify the meaning of ambiguous terms. However, such evidence is not admissible against a party who is not a member of the trade or profession unless he knows or ought to know the usage or custom. 2 Corbin, *Contracts* § 542, pp. 111-12.

The Policy specifies that Evanston "will determine the value of Covered Property . . . at actual cash value as of the time of loss." (Docket no. 22-4 at 15.) The coinsurance provision reduces Evanston's liability if the limit of insurance is not at least 80% of "the value of Covered Property at the time of loss." (*Id.* at 16.) The Policy does not define "actual cash value." Michigan courts recognize that no "set method [of valuation] is necessary within the appraisal context." *Davis v. National Am. Ins. Co.*, 259 N.W.2d 433, 437 (Mich. Ct. App. 1977). Neither market value nor replacement value is a touchstone for the value of real property.

"Actual cash value" is often used within the insurance industry to mean replacement cost minus depreciation - the method Evanston urges. Were the term so defined in the Policy, the Court might well employ that meaning here. However, the Policy does not define the term. A variety of methods are used to determine the value of real property, including market value, replacement cost,

replacement cost minus depreciation, and stream of income.[1] The meaning of actual cash value is ambiguous. Although it is customarily defined within the insurance industry as replacement cost minus depreciation, Cogswell is not a member of that industry. Evanston has not presented evidence that Cogswell knew, or should have known, the meaning of actual cash value customarily employed in the insurance industry. Accordingly, this extrinsic evidence cannot be used to construe the term.

The Policy itself cuts against this customary meaning. An optional provision (G(3)(a) - Optional Coverages) of the Policy provides that "Replacement Cost (without deduction for depreciation) replaces Actual Cash Value in the Loss Condition, Valuation, of this coverage form" under various circumstances. (Docket no. 22-4 at 18.) If actual cash value is understood as replacement cost minus depreciation, the phrase "without deduction for depreciation" in this provision is nugatory. Canons of construction prohibit an interpretation which does not give effect to every word and phrase of the agreement. *Fresard v. Michigan Millers Mut. Ins. Co.*, 327 N.W.2d 286, 289 (Mich. 1982). Accordingly, the Court finds that actual cash value does not necessarily mean replacement cost minus depreciation.

Michigan courts recognize that no "set method [of valuation] is necessary within the appraisal context." *Davis*, 259 N.W.2d at 438. Instead, they use the "broad evidence rule," which permits an appraiser to consider "any evidence logically tending to the formation of a correct estimate of the value of the destroyed or damaged property." *Id.* Market value, replacement value, and other means of valuation are merely guides, "rather than shackles compelling strict adherence." *Id.*

---

[1] The stream of income methodology is often used to value commercial property by calculating the present value of the net rents the property is expected to generate henceforth.

7

Where, as in the instant case, replacement value minus depreciation and market value yield vastly disparate valuations, a single method of valuation is less likely to establish a property's value accurately. This is particularly true of relatively illiquid property such as real estate. In the absence of a contractual definition of "actual cash value," Michigan law favors the consideration of all evidence relevant to an accurate determination of the Property's value. *Id.* The appraisers and umpire must consider all relevant evidence as they determine the Property's actual cash value.

## Conclusion

Evanston's agreement to insure the Property for $1,000,000 was not an admission that the Property was worth that amount, nor is Evanston estopped to assert that it is worth more. The Property's value must be determined by appraisers and an umpire, as agreed in the Policy and required by Michigan law. Accordingly, Cogswell's Motion for Summary Judgment is denied. Evanston's Motion for Summary Judgment is granted. As the Policy does not define actual cash value, all evidence relevant to an accurate determination of the Property's value must be considered. While replacement cost minus depreciation is one relevant means of determining the Property's value, it is not necessarily the sole or preferred means. Replacement cost minus depreciation is one of several methods pertinent to an accurate valuation that may be utilized by the umpire and appraisers.

A separate Order will issue.


Dated: January 23, 2009              /s/ Gordon J. Quist
                                    GORDON J. QUIST
                                    UNITED STATES DISTRICT JUDGE

8